# ENVIRONMENT

**LAND USE & PLANNING – GROWTH TIERS – WHETHER A LOCAL JURISDICTION IS PROHIBITED FROM AUTHORIZING MAJOR SUBDIVISIONS SERVED BY SEPTIC SYSTEMS IF THE JURISDICTION'S GROWTH TIERS DO NOT COMPLY WITH THE STATUTORY CRITERIA – WHETHER THE STATE MUST ENFORCE VIOLATIONS OF THE STATUTE**

February 15, 2019

*The Honorable Kumar P. Barve*
*House of Delegates of Maryland*

You have asked for our opinion on two questions regarding the Sustainable Growth and Agricultural Preservation Act of 2012 (the "Act"). *See* 2012 Md. Laws, ch. 149. The Act was passed in response to a federal mandate under the Clean Water Act that required Maryland to demonstrate how it would reduce nutrient pollution to the Chesapeake Bay, including how it would reduce nitrogen discharges from on-site sewage disposal systems, more commonly known as "septic systems" or "septics." 2012 Md. Laws, ch. 149, Preamble; *see also* U.S. Environmental Protection Agency's Interim Expectations for the Phase III Watershed Implementation Plans (Jan. 2017 Interim Version) ("Phase III Interim Letter"). In an effort to fulfill that mandate, the Act effectively requires that local jurisdictions wishing to authorize certain types of major residential subdivisions—especially major subdivisions on septics—must first adopt a map of up to four "growth tiers." Those growth tiers, broadly speaking, describe the type of development that may occur in each "tier" and set the method of sewage treatment that may be used for residential subdivisions within each tier. *See* Md. Code Ann., Land Use ("LU") § 1-502; Md. Code Ann., Envir. ("EN") § 9-206. A local jurisdiction that does not adopt tiers "in accordance with" the Act is prohibited, among other things, from authorizing a major residential subdivision served by septics anywhere in the jurisdiction. EN § 9-206(f). Instead, such a local jurisdiction may authorize a major subdivision only if the subdivision will be served by public sewer and is located in an area that meets the criteria for "Tier I" land. *See* EN § 9-206(f)(2).

According to your request, one local jurisdiction has adopted growth tiers that do not meet the Act's criteria for determining which area should be included in which tier. *See* LU § 1-508 (setting those criteria). Based on that understanding, you ask two questions, which we have rephrased slightly:

> 1.    Is a local jurisdiction with a noncompliant growth tier map prohibited from authorizing a major residential subdivision on septic systems?
>
> 2.    Does the Act, or any other State law, compel the State to enforce violations of the Act?

With respect to your first question, it is our opinion that a local jurisdiction with a noncompliant growth tier map is generally prohibited from approving a major residential subdivision unless the subdivision is served by public sewer and is located in a Tier I area.  Thus, in such a jurisdiction, major subdivisions on septics generally would not be permitted, even in areas where they would otherwise be permissible had the locality adopted a compliant tier map.  Under EN § 9-206(f), a local jurisdiction may approve major subdivisions other than those on public sewer in a Tier I area only if the jurisdiction has adopted a tier map "in accordance with" the Act or, in other words, has adopted a map that complies with the Act's criteria for mapping the growth tiers.  A noncompliant tier map does not meet that condition.  It is possible, however, that a noncompliant tier map with minor errors or inaccuracies might substantially comply with the Act under limited circumstances.

With respect to your second question, no State law "compels" the State to bring an enforcement action directly against a local jurisdiction for violating the Act.  However, the Maryland Department of the Environment ("MDE") likely has authority to disapprove certain applications, permits, and plans related to water and sewer issues when those applications, permits, and plans conflict with the Act.  To take just one example, it appears that MDE must at least consider compliance with the Act as part of the process for evaluating permits to construct waste-disposal systems and would have little, if any, discretion to overlook a noncompliant tier map when reviewing a permit application to build a septic system for a major residential subdivision.  In that sense, MDE is charged with enforcing the Act. Moreover, MDE has broad discretionary authority to enforce violations of Title 9, Subtitle 2 of the Environment Article, including the provisions of the Act that prohibit local jurisdictions from authorizing major subdivisions on septic systems unless the jurisdiction has complied with the Act's tier-mapping criteria.  Although that power is discretionary and does not "compel" enforcement, the failure of local jurisdictions to comply with the Act could risk breaking Maryland's commitments under the Clean Water Act to reduce nutrient pollution in the Bay.

If the U.S. Environmental Protection Agency ("EPA") finds that Maryland has broken its commitments, EPA could take certain actions against Maryland, such as subjecting Maryland to increased federal oversight and reducing the State's federal funding. Thus, as a practical matter, MDE might need to take enforcement action to ensure that it can meet its obligations under the Clean Water Act.

# I

## Background

### A.  The History of the Act: The Role of the 2010 Chesapeake Bay TMDL in its Enactment

The General Assembly adopted the Act to address an impending federal mandate that required Maryland and the six other jurisdictions in the Chesapeake Bay watershed (the "Bay jurisdictions") to demonstrate, before December 30, 2012, how each jurisdiction would reduce its nutrient discharges to the Bay. 2012 Md. Laws, ch. 149, Preamble. That mandate was the product of the "2010 Chesapeake Bay Total Maximum Daily Load," or "Bay TMDL," a Bay-wide planning document that EPA had issued pursuant to the federal Clean Water Act and various consent decrees. *See generally Maryland Dep't of the Env't v. Anacostia Riverkeeper*, 447 Md. 88, 101-07 (2016). Although much of the 2012 Act is codified in the Land Use Article, it was enacted to enable Maryland to meet the Clean Water Act requirements set by EPA under the Bay TMDL, *see* 2012 Md. Laws, ch. 149, Preamble, and therefore it must be read in the context of those requirements.

### 1.  Applicable Clean Water Act Requirements

The Clean Water Act seeks to ensure "fishable and swimmable" waters. *Shanty Town Assocs. Ltd. P'ship v. EPA*, 843 F.2d 782, 784 (4th Cir. 1988). The federal statute implements that goal primarily by regulating discharges from point sources, such as pipes, through a permitting system that controls what the permit-holder may discharge. *See American Farm Bureau Fed'n v. United States Envtl. Prot. Agency*, 792 F.3d 281, 299-300 (3d Cir. 2015). Point-source dischargers include wastewater treatment plants, power plants, manufacturing and commercial entities, and municipal stormwater systems. Point-source permitting, however, does not address pollution caused by "nonpoint sources" that discharge pollutants through seepage and run-off, instead of through a pipe. Examples of nonpoint source discharges include seepage from septic systems, run-off from stormwater that is not

collected into a stormwater management system, agricultural run-off, and air pollution. When a body of water remains impaired by a particular pollutant despite point-source regulation, the affected State must also regulate nonpoint source discharges of that pollutant. Specifically, the State must set a pollution "diet," expressed as a "total maximum daily load" ("TMDL") for the pollutant, and then decide how to allocate the required reductions among various point-source and nonpoint source discharges.

A State's TMDL is subject to EPA's approval. Failing that approval, or failing the State's submission of a proposed TMDL, EPA itself must issue the TMDL. 33 U.S.C. § 1313(d)(2). Once a TMDL has been set, the State must implement that TMDL through a continuing planning process subject to EPA's approval. 33 U.S.C. § 1313(e). The TMDL must, among other things, demonstrate "reasonable assurance" that the jurisdiction can meet the reductions in load and that the body of water can attain its necessary water quality standard when those reductions are achieved. Bay TMDL, ES-8; *see also Farm Bureau,* 792 F.3d at 291-92 (illustrating EPA's use of "reasonable assurance[s]" in adopting a TMDL). Although "it is up to the States to choose how to implement [their] plans," they "are often left with the difficult choice of implementing the TMDL in accordance with EPA's suggestions, or face losing federal grants if they do not." *Food & Water Watch v. United States Envtl. Prot. Agency*, 5 F. Supp. 3d 62, 77 (D.D.C. 2013) (citing 33 U.S.C. § 1313(e)).[1]

### 2. *The Bay TMDL*

By 2012, the pollution of the Bay by nutrient discharges, especially nitrogen discharges like sewage, had been known and studied for decades.[2] *See, e.g.*, 2012 Md. Laws, ch. 149, Preamble.

---

[1] The Clean Water Act also includes special provisions for the Chesapeake Bay: The EPA Administrator, "in coordination with" the signatories to the Chesapeake Bay Agreement, "shall ensure that management plans are developed and implementation is begun . . . to achieve and maintain . . . the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed." 33 U.S.C. § 1267(g). Maryland is a signatory to the Chesapeake Bay Agreement and thus subject to those requirements. *See* Chesapeake Bay Watershed Agreement (2014) (Preamble; Affirmation).

[2] *See* Chesapeake Bay Program Technical Studies: A Synthesis i-I, United States Environmental Protection Agency (1982) (summarizing

Those nitrogen discharges from sewage can be reduced by directing the sewage to an upgraded wastewater treatment plant, which treats the sewage and then discharges it through a point source regulated through the Clean Water Act's permitting system. Bay TMDL, 4-37. But on-site sewage disposal systems are not "point sources," so the seepage of nitrogen from those facilities into the Bay is not regulated through the permitting system.

Before the Bay TMDL, there was no comprehensive system for reducing, tracking, and allocating nutrient discharges to the Bay from nonpoint sources, including septics. *Id.*, ES-3. EPA's issuance of the Bay TMDL in December 2010 filled that void by putting the Bay jurisdictions on a diet to reduce their nitrogen, phosphorus, and sediment discharges (known as pollutant "loads") from *all* pollution sources, including nonpoint sources like septic systems. *See Anacostia Riverkeeper*, 447 Md. at 106-07. The Bay TMDL allocates shares of the diet among the watershed states and by major river basin. Bay TMDL, ES-5, ES-7. For all jurisdictions, the Bay TMDL set a target of 2017 for achieving 60% of the required reductions and a target of 2025 for 100% of the reductions. The Bay jurisdictions, collectively, must reduce their total nitrogen discharges by 25% by 2025. *Id.*, ES-1; *see also Farm Bureau*, 792 F.3d at 292 (describing the Bay TMDL). To achieve that overall goal, the Bay TMDL requires Maryland to reduce nitrogen discharges by 10.33 million pounds per year in order to reach a target of 39.09 million pounds. *See* Maryland's Phase I Watershed Implementation Plan for the Chesapeake Bay Total Maximum Daily Load ES-7 to ES-8 (Dec. 3, 2010) ("Phase I WIP").

While preparing the Bay TMDL, EPA had determined specific load limits for each pollutant and had required each jurisdiction to create an initial Phase I "Watershed Implementation Plan," or "WIP," to demonstrate the state's methods for achieving the required reductions. *Id.*, ES-3, 5; *see also Anacostia Riverkeeper*, 447 Md. at 109-10 (explaining the importance of WIPs to the TMDL process). EPA also set deadlines for the submission of Phase II WIPs, due in late 2011, and Phase III WIPs,

---

results of studies of nutrient pollution of the Bay). For a history of the Bay jurisdictions' joint efforts, over more than three decades, to address the pollution of the Bay by nutrients, *see, e.g,* Rena Steinzor and Shana Jones, *Collaborating to Nowhere: The Imperative of Government Accountability for Restoring the Chesapeake Bay,* 4 Geo. Wash. J. of Energy & Envtl. L. 51 (2013).

due in 2017. *See* Letter from William C. Early, Acting EPA Regional Administrator to Hon. L. Preston Bryant, Chair, Chesapeake Bay Programs' Principals' Staff Committee (Nov. 4, 2009) ("Expectations Letter"). In preparing their Phase I WIPs, the watershed States were to allocate shares of the load limits for each pollutant among various sectors identified by EPA. The point-source sectors included wastewater treatment plants and industrial facilities, and nonpoint sources were categorized into agricultural, stormwater run-off, septic, and forest sectors. Bay TMDL, ES-8, ES-9, 4-1, 4-5. Only after the State made allocations among those sectors could the State model, monitor, and reduce each sector's discharges to keep the sector from exceeding its assigned share. *See, e.g.*, Phase I WIP, ES-2, ES-3, ES-6 (stating that the WIP's function is to "identify final target loads to be achieved by various pollution source sectors" as part of the "accountability framework" to "ensure the TMDL goals are reached in a reasonable timeframe"); *Anacostia Riverkeeper,* 447 Md. at 107-08 (explaining the role of modeling in the implementation of the Bay TMDL). In essence, discharges from the various sectors would have to be reduced, and Maryland would have to decide how to distribute the burden among the sources in each sector.

The Bay jurisdictions would also have to demonstrate that their plans would work in practice. Bay TMDL, 7-6. EPA therefore required the jurisdictions to demonstrate "reasonable assurance" that they could actually achieve the required pollution reductions. Bay TMDL, 7-1; *see also Anacostia Riverkeeper*, 447 Md. at 109-10, 127-28 (emphasizing the importance of the requirement that MDE provide "reasonable assurance" to EPA). As part of that demonstration, each jurisdiction had to "describe procedures for estimating additional loads due to growth" and to plan for "additional pollutant load reductions that are at least sufficient to offset the growth and development that is anticipated in the watershed between 2011 and 2025." Bay TMDL, 7-6. The Bay jurisdictions were to submit their initial watershed implementation plans in 2010. Then, in 2011, the jurisdictions were to begin preparing their Phase II plans for submission. *Id.*, 7-7. EPA made clear that a jurisdiction's failure to make satisfactory progress or to adopt sufficient plans could result in any of numerous "back-stop" actions by EPA, including a significant

curtailment of the water-pollution powers that EPA had delegated to the State and a loss of federal funding.[3]

To comply with these requirements, therefore, Maryland would need to demonstrate how it would reduce nitrogen discharges from each sector of point-source and nonpoint-source discharges. By 2010, Maryland had long regulated point sources through its permitting system and had also regulated many nonpoint source discharge sectors. However, Maryland had never established an overall mechanism for managing discharges from the septics sector.

### 3. *The Failure of the First Septics Bill and the Development of the Tier Approach by the Task Force Created to Address the Impacts of Major Developments Served by Septics*

Maryland submitted the final draft of its Phase I WIP in December 2010. The Phase I plans were only required to identify, "to the extent that it [was] available," the "specific actions and controls that will be implemented by 2017." Expectations Letter (Enclosure B at 14). In its plan, Maryland projected that septics-served households in the State would increase by 75,000 by 2020 and would result in increased nitrogen discharges of 1.4 million pounds per year. Those increased nitrogen discharges from septics thus would have to be offset by higher reductions in other uses. Phase I WIP at 3-3 to 3-4. Later, Maryland would have to provide information about how to achieve those offsets in its Phase II WIP.

---

[3] EPA listed the following "back-stop" actions:

> [E]xpanding coverage of [point-source] permits to sources that are currently unregulated, increasing oversight of state-issued [point-source] permits, requiring additional pollution reductions from point sources such as wastewater treatment plants, increasing federal enforcement and compliance in the watershed, prohibiting new or expanded pollution discharges, redirecting EPA grants, and revising water quality standards to better protect local and downstream waters.

*Id.*, ES-8; *see also* Letter from Acting EPA Regional Administrator William C. Early to Hon. L. Preston Bryant, Chair, Chesapeake Bay Programs' Principals' Staff Committee (Dec. 29, 2009) ("Consequences Letter").

MDE began preparing its Phase II WIP in 2011. That year, legislation was introduced to "[l]imit[] the number of on-site sewage disposal systems and improv[e] those systems," with the goal of "reducing the nitrogen load to the Chesapeake Bay, focusing development within Priority Funding Areas, and preserving agricultural and rural land and the character of those areas." H.B. 1107, 2011 Leg. Reg. Sess., Preamble. Although the bill did not pass, then-Governor O'Malley appointed a 28-member task force that included representatives from the Maryland Farm Bureau, the Maryland Association of Counties, the Maryland Municipal League, environmental organizations, and various government agencies to reach consensus on legislation to achieve those goals. Executive Order 01.01.2011.05. The task force was also to address "the impact of major developments on septic systems and their effects on nutrient pollution, land preservation, agri-business, and smart growth." *Id.*

In its report, the task force acknowledged EPA's "accountability framework" and agreed on a "Comprehensive Plan Tier Approach" under which "[l]ocal jurisdictions should designate areas within . . . [their] comprehensive plan[s] into one of four tiers" and then require "[w]astewater disposal methods, rural preservation spending, and other criteria [to] vary by land use tier." Final Report of the Task Force on Sustainable Growth & Wastewater Disposal 1, 5 (Dec. 2011). With little dissent, the task force then outlined four tier classifications based on criteria such as the availability of public water and sewer and the existence of areas that were designated or planned for conservation. *Id.* at 5-7. As is particularly relevant here, one goal was that major residential developments would be directed toward areas planned for public sewer service. *Id.* The task force submitted its report in December 2011. Meanwhile, Maryland had to prepare its Phase II WIP.

> ### 4. EPA's Instructions for Maryland's Phase II WIP: Describe How Maryland Will Either Avoid or Offset Any Growth in Nonpoint Source Discharges from Septics, Agriculture, and Development Sources

In February 2012, EPA instructed Maryland further on what it had to include in its Phase II WIP. *See* EPA Evaluation of Maryland's Trading and Offset Program, 3 (Feb. 17, 2012). According to EPA, by the end of the year, Maryland had to show more definitively how it would address any increased discharges caused by growth in nonpoint source sectors, especially with regard to "septics, agriculture and development." *Id.* at 17-19. EPA gave Maryland three choices: (1) develop a credible offset program for

a sector that would require any growth in that sector to be offset by reductions from the other sectors; (2) show "quantitatively" why the sector was not growing; or (3) if the sector was growing, show "quantitatively" why it was not contributing new or increased loads. *Id.*

Maryland thus faced the following situation at the outset of the 2012 legislative session: Maryland had to reduce its nitrogen, phosphorus, and sediment discharges to the Bay by 2025, and during 2012, Maryland would have to demonstrate to EPA *how* each nonpoint source sector would achieve those reductions. Moreover, that year, in its Phase II WIP, Maryland would have to show how it would achieve the reductions if any particular sector grew. Even if no sector grew, Maryland would have to predict land uses to determine the necessary reductions for each sector and to track actual reductions for purposes of reporting on the attainment of milestones. Noncompliance with the TMDL process could result in loss of federal funding, loss of control over point-source permitting, regulation of previously unregulated dischargers, and other negative consequences.

### B. The Adoption of the Act in 2012: The Legislative Decision to Preserve Agricultural Uses by Limiting Residential Development on Septics to Certain "Tiers" of Land

New septics legislation was introduced in 2012. The legislation, which eventually passed and became the Act, "embodie[d] the nearly unanimous recommendations of the Task Force," including the tier-mapping mechanism for allocating growth among different land uses. *See* Md. Laws, ch. 149, Preamble. In the Preamble, the General Assembly expressly acknowledged Maryland's obligations under the Bay TMDL. *Id*. Explaining that federal law would require the State to give EPA a detailed "Phase II" plan with "specific actions" for achieving the required reductions in nitrogen discharges to the Bay, the General Assembly recognized that the State had to ration the reductions among various types of users. *Id*. The General Assembly also found that development using septics, if allowed to continue at the current rate and in the same way, would *increase* the load of nitrogen added to the State's waters. *Id*. That increase would require Maryland to tighten restrictions on other nitrogen sources, such as farms, wastewater treatment plants, and stormwater run-off

from existing urban uses, thereby "constraining economic growth and placing additional burdens on the agricultural community." *Id.*

In an effort to avoid those negative results, and to enable Maryland to provide "reasonable assurance" to EPA that the State could meet its obligations under the Bay TMDL, the General Assembly designed the Act in large part to account for, predict, and place limits on major residential development, especially development served by septic systems. The Act sought to achieve those purposes primarily by establishing four land use tiers (i.e., Tiers I, II, III, and IV) and by prohibiting local jurisdictions from authorizing major residential subdivisions, including major subdivisions on septics, in certain tiers and under certain circumstances.[4] *See* LU § 1-508.

Tier I applies to areas "served by public sewerage systems and mapped [as] locally designated growth areas," while Tier II includes areas "planned to be served by public sewerage systems" and designated for growth by the local jurisdiction. LU § 1-508(a)(1)-(2). These two tiers are intended to reflect the areas within the county where major growth is expected to occur and where such development should therefore be served by public sewer systems. Your questions pertain more to Tiers III and IV—two lower-growth areas not planned to be served by public sewer.

We start with Tier IV, the lowest growth area, because it is somewhat easier to understand than Tier III. In essence, Tier IV denotes areas that are not planned for public sewer service and that are either dominated by agricultural lands, forested lands, and other natural areas, or are designated in one of a number of ways for preservation or conservation. *See* Maryland Dep't of Planning, *Implementation Guidance for The Sustainable Growth and Agricultural Preservation Act of 2012*, at 10 (Aug. 1, 2012) ("MDP Implementation Guide"). More specifically, Tier IV comprises:

---

[4] There is no single, State-wide definition of major or minor subdivisions under the Act. Instead, the Act contemplated that local jurisdictions would adopt their own definitions of major and minor subdivisions for purposes of the Act and also placed important limitations on those local definitions. For a local definition adopted before December 31, 2012, a "minor subdivision" may not exceed 7 new lots. EN § 9-206(a)(6)(i)(1)(B). If a local jurisdiction did not adopt definitions of major and minor subdivision applicable to the Act by December 31, 2012, a "major subdivision" is "five or more new lots . . . or other divisions of land," and a "minor subdivision" is "fewer than" that number. EN § 9-206(a)(5), (6).

(i) areas planned or zoned by a local jurisdiction for land, agricultural, or resource protection, preservation, or conservation;

(ii) areas dominated by agricultural lands, forest lands, or other natural areas; or

(iii) rural legacy areas, priority preservation areas, or areas subject to covenants, restrictions, conditions, or conservation easements for the benefit of, or held by a State agency, as defined in § 9-206 of the Environment Article, or a local jurisdiction for the purpose of conserving natural resources or agricultural land.

LU § 1-508(a)(4).

Tier III includes other areas not planned for sewer service but where the local jurisdiction is planning for growth or for "large lot development." MDP Implementation Guide at 10. Tier III also includes municipal corporations and "existing Rural Villages and towns" that are not served by public sewer. *Id.* In other words, Tier III denotes areas that:

(i) are not planned for sewerage service and not dominated by agricultural or forest land;

(ii) are not planned or zoned by a local jurisdiction for land, agricultural, or resource protection, preservation, or conservation; and

(iii) are one of the following:

1. municipal corporations not served by a public sewerage system;

2. rural villages as described in § 5-7B-03(f) of the State Finance and Procurement Article;

3. mapped locally designated growth areas; or

4. areas planned and zoned for large lot and rural development[.]

LU § 1-508(a)(3). With a few limited exceptions, Tier III areas are generally the only areas under the Act in which major residential development on septic systems is allowed to occur. *See* EN § 9-

206(g)(1) (explaining the type of sewage treatment method permissible for residential subdivisions in each tier).[5]

Although the Act does not expressly require a local jurisdiction to adopt these tiers, *see* LU § 1-502 (providing that a local jurisdiction "*may* adopt" tiers (emphasis added)), the Act gives local jurisdictions a significant incentive to do so. Specifically, a local jurisdiction cannot approve a "residential major subdivision" other than one served by public sewer in a "Tier I" area until the jurisdiction has adopted a map that classifies the land within its borders "in accordance with" the tier-mapping provisions in Title 1, Subtitle 5 of the Land Use Article. EN § 9-206(f).[6] Put another way, a local jurisdiction that has not adopted

---

[5] In some cases, a specific geographic area may not "fit" neatly into any of the tiers. MDP Implementation Guide at 12. For example, an area might be served by public sewer but not within a designated growth area (and thus not within Tier I as defined by the Act), such as when public sewer is extended to a non-growth area to relieve that area's failing septic systems. *See id.* The Department of Planning has provided recommendations to the local jurisdictions about how to best classify those areas, using designations like Tier IA, IIA, IIIA, and IVA, but has recognized that such areas might properly be placed in more than one tier. *Id.*

[6] Although this provision states that a local jurisdiction's tier map must be adopted "in accordance with *§ 5-104 of the Land Use Article*," EN § 9-206(f) (emphasis added), that appears to be a drafting error. Section 5-104 does not govern the adoption of a local jurisdiction's tier map, so that section cannot possibly be the provision to which the General Assembly meant to refer. To the contrary, as originally enacted, the statute cross-referenced a different provision in Article 66B of the Maryland Code—a provision which is now codified as Title 1, Subtitle 5 of the Land Use Article. *See* 2012 Md. Laws, ch. 149 (providing that local jurisdictions had to adopt their growth tiers "in accordance with § 1.05 of Article 66B"). While it is not entirely clear why the current statute refers to § 5-104 instead of Title 1, Subtitle 5, it appears that the error occurred as part of the process for transferring the provisions of Article 66B into the new Land Use Article. As originally enacted, the provisions of the Act governing the adoption of "growth tiers" were codified in Article 66B, § 1.05. Later during the same legislative session, the General Assembly reorganized Article 66B into the newly created Land Use Article. *See* 2012 Md. Laws, ch. 426. When the provisions that had been in § 1.05 of Article 66B were recodified as Title 1, Subtitle 5, *see* LU §§ 1-501 to 1-509, the Legislature did not update the cross-reference in EN § 9-206(f), leaving the obsolete reference to Article 66B. Our Office identified that problem, *see* Letter of Attorney General Douglas F. Gansler to Governor Martin O'Malley (April 27,

growth tiers into its comprehensive plan "in accordance with" the Land Use Article can only authorize *minor* residential subdivisions on septics (as well as major or minor subdivisions served by public sewer in a Tier I area). EN § 9-206(f)(2).[7]

Separate requirements apply to jurisdictions that do adopt tiers "in accordance with" the Land Use Article. Those jurisdictions may approve major subdivisions in more areas, but they still may only approve a residential subdivision in a "tier" eligible for that use. *See* EN § 9-206(g). For example, residential subdivisions in Tier I are not eligible for septic; they must be served by public sewer. EN § 9-206(g)(1)(i). Similarly, in Tier II, only minor residential subdivisions on septics may be approved; major subdivisions must be served by public sewer. EN § 9-206(g)(1)(ii). In Tier III, a local jurisdiction may approve a major subdivision only if the local planning board has recommended approval after a public hearing and a review of various factors, including "potential environmental issues." LU § 5-104. Finally, for Tier IV areas, a local jurisdiction may not authorize a major subdivision, regardless of the method of sewerage service, unless MDP has certified that the project qualifies for an exception based on the density of the developments in the jurisdiction. EN § 9-206(g)(1)(iii), (h).

## C. *The Tier Mapping Process*

The Act also addressed the mechanics of tier-mapping. The Act generally did not require counties to re-inventory the areas in their respective jurisdictions. Instead, in an uncodified section, the General Assembly stated its intent that the counties could do their

---

2012), and as part of the next year's corrective bill, the Legislature attempted to update the cross-reference. *See* 2013 Md. Laws, ch. 43. However, in doing so, the General Assembly accidentally cross-referenced the wrong provision, i.e., LU § 5-104, rather than Title 1, Subtitle 5. (In fact, what is now LU § 1-504 had not even been located in § 1.05 of Article 66B at all; it was codified in § 1.06 instead.) The most likely explanation for that mistake is that the drafters copied an existing cross-reference in a nearby subsection that had correctly referred to LU § 5-104. *See* EN § 9-206(g)(1)(iv). In any event, whatever the reason for the error, we read EN § 9-206(f) as requiring a local jurisdiction's tier maps to be adopted "in accordance with" Title 1, Subtitle 5 of the Land Use Article. *See also* footnote 9, *infra*.

[7] Under LU § 1-506, a county may choose not to adopt Tier II so long as it documents its reasons for that choice.

tier-mapping from information already included in their comprehensive plans and zoning ordinances:

> It is the intent of the General Assembly that local jurisdictions should use their existing comprehensive plan and zoning ordinance, if desired, to create the tiers as provided in Article 66B, § 1.05 of the Code and Title 1, Subtitle 5 of the Land Use Article, as enacted by this Act.

2012 Md. Laws, ch. 149 § 4(a). As explained by MDP, "[m]apping the Growth Tiers . . . is intended to be a straight-forward exercise based on existing local government plans and goals for growth and land preservation," such that "most of the Tier mapping will be a reflection of existing zoning, comprehensive plans and sewer service." MDP Implementation Guide at 1. Accordingly, many of the tier definitions are couched in the land-planning vocabulary that local governments were already using in their zoning maps, comprehensive plans, and other similar planning documents. For example, areas to be mapped Tier IV include rural legacy areas and priority preservation areas, LU § 1-508(a)(4)(iii), both of which are defined by statute.[8]

When preparing a tier map, a local jurisdiction "may submit the [jurisdiction's] proposed tiers and any relevant information to [MDP] for . . . technical assistance, review, and comment." LU § 1-503. After adopting growth tiers, the local jurisdiction must provide to MDP "information necessary to demonstrate the precise location of the tiers," including, as necessary, maps and relevant water and sewer plans. LU § 1-504. MDP then "may comment on the growth tiers." LU § 1-505. If MDP chooses to comment, the local legislative body or planning board must "review the [adopted] mapped growth tiers . . . in light of th[ose] comments" and "hold at least one public hearing on the comments." LU § 1-507(a)-(b). Finally, the Act requires jurisdictions that adopt tiers to incorporate them into their comprehensive plans. LU § 1-509.

### D.   EPA's Approval of Maryland's Phase II WIP "In Reliance" on the Act

As the General Assembly had intended, the State presented the Act to EPA as evidence of "specific actions that, once

---

[8]   Md. Code Ann., Nat. Res. ("NR") § 5-9A-02(i); Md. Code Ann., Agric. ("AG") § 2-518; Md. Code Ann., State Fin. & Proc. ("SFP") § 5-408.

implemented, will achieve the reductions necessary to meet the nutrient and sediment limits by 2025." *See* 2012 Md. Laws, ch. 149, Preamble; *see also* EPA Evaluation of Maryland's Final Phase I and 2012-2013 Milestones; Phase II WIP at 48, 81. EPA approved Maryland's Phase II Plan "in reliance" on Maryland's representations. *Anacostia Riverkeeper*, 447 Md. at 127-28. In fact, in its evaluation of Maryland's plan, EPA specifically stated that "achievement of projected pollutant load reductions will be supported by key state legislation passed in the 2012 session," including the Act. EPA Evaluation of Maryland's Final Phase II Watershed Implementation Plan, at 1 (May 30, 2012) ("EPA Evaluation of Phase II WIP"); *see also id.* at 3 (noting that Maryland had made three "[k]ey improvements since draft Phase II WIP and final 2012-2013 milestone submission"). Specifically, EPA noted that Maryland had enacted a "requirement, beginning December 31, 2012, for local jurisdictions to adopt a four-tiered system to guide growth on central sewer and septic systems, before a jurisdiction may approve a major residential subdivision served by onsite sewage disposal systems, community sewerage systems, or shared systems." *Id.* EPA then stated: "EPA will maintain 'ongoing oversight' for all sectors in Maryland to ensure that commitments are implemented." *Id.*

### E. Cecil County's Growth Tiers

Your letter explains that your questions were prompted by the tier designations adopted by Cecil County. In December 2012, Cecil County adopted growth tiers. MDP commented on those tiers pursuant to LU § 1-505 and found that the tier designations conflicted with the statutory criteria in multiple ways. *See* letter from Richard Josephson, Director of Planning Services, MDP, to Hon. Tari Moore, County Executive of Cecil County (Dec. 27, 2012). Among other things, MDP found that the county had not classified priority preservation areas, rural legacy areas, or areas planned or zoned for agricultural or resource protection as Tier IV land, instead designating those areas as Tier III. *Id.* Those designations, MDP explained, conflicted with the statutory criteria providing that such areas are supposed to be in Tier IV. LU § 1-508(a)(4)(iii). Cecil County held a public hearing on the Department's comments, as required under LU § 1-507, but did not modify or amend its adopted tier designations. In December 2016, the County incorporated its growth tier map into its comprehensive plan.

## II

## Analysis

You pose two questions about the Act.  First, you ask whether a local jurisdiction has the authority to approve a major residential subdivision on septics if the local jurisdiction has adopted a tier map that does not comply with the Act's criteria.  Second, you ask whether the State is "compel[led]" to enforce a local jurisdiction's compliance with the Act.  We will address each question in turn.  However, before doing so, we will set forth some general principles about the respective powers of the State of Maryland and its political subdivisions.

Maryland's counties and municipalities "are but local divisions of the state."  *Rockville v. Randolph*, 267 Md. 56, 62 (1972).  They therefore possess only the powers granted to them by the State, either through the Maryland Constitution or enactments of the General Assembly.  *See Kent Island Def. League, LLC v. Queen Anne's County Bd. of Elections*, 145 Md. App. 684, 688-89 (2002).  As a corollary to that principle, when a local jurisdiction exercises a power delegated to it by the General Assembly, the local jurisdiction's power is "subject to the terms upon which it is delegated."  *Hewitt v. County Comm'rs of Baltimore County*, 220 Md. 48, 63 (1959); *see also West Montgomery County Citizens Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n*, 309 Md. 183, 198-99 (1987) (invalidating county's exercise of power "in any manner other than that specifically authorized" by the enabling statute).  Thus, a local enactment that exceeds the scope of the delegation or that violates the conditions on that delegation is invalid.  *See, e.g.*, *West Montgomery County Citizens Ass'n*, 309 Md. at 198-99.

In the area of land use, the State has delegated various powers to local jurisdictions, but those powers are subject to many State-law requirements.  *See, e.g.*, LU §§ 3-101, 3-102 through 3-113 (requiring counties to adopt comprehensive plans with certain plans and elements; requiring counties to specify how the plans will protect certain uses); LU § 1-415 (requiring home-rule counties to implement the statutorily required visions through their comprehensive plans)*; see also* LU § 1-203 (providing for automatic repeal of commissioner-county ordinances to the extent that they are inconsistent with Division I of the Land Use Article); *Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 87-89 (2009) (explaining that State law imposes limits on local governments' land use powers); *Mayor & Council of Rockville v. Rylyns Enters.*,

372 Md. 514, 574 n. 31, 575 (2001) (explaining that local governments "wield only such [land use] powers as are granted to them by the Legislature" and subject to the limitations imposed by State law); *cf.* Md. Code Ann., Local Gov't § 10-324(c) (providing that the land use powers that the Express Powers Act grants to charter and code home rule counties do not preempt the State's regulatory authority).

In addition to the limits imposed by the Land Use Article, local jurisdictions' land-use powers are also circumscribed by the State's environmental laws. Particularly relevant here are the State's laws regarding the "waters of the State" and sewerage systems, as set forth in Title 9 of the Environment Article. Under those laws, the Secretary "[h]as supervision and control over the sanitary and physical condition of the waters of this State to protect public health and comfort," and "[s]hall investigate . . . [a]ll points of sewage discharge." EN § 9-252(b)(1), (2); *see also Department of Env't. v. Showell*, 316 Md. 259, 269 (1989) (describing the Secretary's "broad powers to regulate sanitary facilities and pollution control measures"). As explained below, MDE's powers in that regard include such matters as approving local water and sewer plans and sewerage facilities, including septic systems. *See* Part II.B, *infra*. Although the General Assembly has delegated to local governments significant authority in the land use context, that local authority does not override the State's water and sewer powers. Indeed, the Court of Appeals has expressly rejected the proposition that "regulation of access to sewer service is purely a matter for local control" or would "usurp[] . . . the power of local governmental entities to control nonpoint source pollution and land use." *Showell*, 316 Md. at 272.

### A. Authority to Approve Major Residential Subdivisions Not Served by Public Sewer: May a Local Jurisdiction that Adopts a Noncompliant Tier Map Approve Those Projects?

With those legal principles in mind, we turn to the Act, and, specifically, § 9-206(f) of the Environment Article, to determine whether a local jurisdiction may approve a major residential subdivision on septics where the jurisdiction has adopted a tier map that does not comply with the Act's requirements. We begin with the "normal, plain" meaning of the words in the statute and read those words in context, keeping in mind the legislative purpose of the enactment. *Lockshin v. Semsker*, 412 Md. 257, 275 (2010).

Under the plain language of the statute, a local jurisdiction "[m]ay not authorize a residential major subdivision served by on-site sewage disposal systems, community sewerage systems, or shared systems until the local jurisdiction adopts the growth tiers in accordance with § 5-104 of the Land Use Article."  EN § 9-206(f)(1).  As explained in footnote 6, *supra*, the reference to § 5-104 of the Land Use Article in EN § 9-206(f) appears to be a drafting error, and the General Assembly instead meant to refer to Title 1, Subtitle 5 of the Land Use Article, where the Act's tier-mapping requirements are actually codified.  In any event, EN § 9-206(f)(1) uses the term "growth tiers," which are defined to mean "the tiers adopted by a local jurisdiction in accordance with Title 1, Subtitle 5 of the Land Use Article."  EN § 9-206(a)(3).  Thus, a local jurisdiction has not adopted "growth tiers" within the meaning of the Act until it has adopted them "in accordance with Title 1, Subtitle 5 of the Land Use Article," EN § 9-206(a)(3), and a local jurisdiction may not authorize a major subdivision on septics (or any other major subdivision, except for one served by public sewer in a Tier I area) until the jurisdiction adopts such "growth tiers."  EN § 9-206(f)(1).[9]

That means, at the very least, a local jurisdiction may not approve a major residential subdivision served by septics if the jurisdiction has declined to adopt a tier map at all.  Such a jurisdiction would instead be limited to approving *minor* subdivisions served by septics or either major or minor subdivisions served by public sewer in a Tier I area.  *See* EN § 9-206(f)(2).  Your question, however, is whether the statute imposes those same limits on a local jurisdiction that has adopted a map, but where the map does not comply with the substantive criteria for tier-mapping set forth in the Land Use Article.  In our opinion, the answer is generally "yes," although that might depend, in some cases, on the type and degree of noncompliance with the Act.

Again, we begin with the words of the statute.  As explained above, EN § 9-206(f)(1) provides, in essence, that a local jurisdiction's authority to authorize a major subdivision on septics is conditioned on that local jurisdiction's adoption of growth tiers "in accordance with" Title 1, Subtitle 5 of the Land Use Article.  To be "in accordance with" statutory provisions typically requires one to comply with those provisions.  *See, e.g.*, *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 107-09 (finding that, when a

---

[9]  If there were any doubt about that, the Legislature also included uncodified language in a related enactment confirming that local jurisdictions must "comply with Title 1, Subtitle 5 of the Land Use Article when adopting growth tiers."  2013 Md. Laws, ch. 521, § 3(d).

master plan that governed a land use action had to be read "in accordance with" a general plan provision, the land use authority had to apply the general plan provision); *Hewitt*, 220 Md. at 63-64 (explaining that, under a statute requiring that zoning regulations be "in accordance with" a locality's comprehensive plan, a "departure" from the comprehensive plan exceeded the locality's authority); *Aberle v. Faribault Fire Dep't Relief Ass'n*, 230 Minn. 353, 360 (1950) (finding that the words "in accordance with" tend to require "compliance"); *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 14 (3d ed. 2011) (explaining that "to be *in accordance* is to be in conformity or compliance"). Applying that ordinary meaning here, given that a local jurisdiction's growth tiers must be adopted "in accordance with" Title 1, Subtitle 5 of the Land Use Article, and given that those provisions establish the criteria for mapping the tiers, *see* LU § 1-508, the plain language of the statute suggests that a locality must adopt its tier map *in compliance with* those criteria.[10]

Thus, under EN § 9-206(f), it appears that the General Assembly has prohibited a local jurisdiction from authorizing any major subdivisions, except for those served by public sewer in a Tier I area, until the locality has adopted growth tiers that comply with the Act's requirements. Put another way, the State has conditioned a local jurisdiction's authority to approve major residential subdivisions served by septics on that local

---

[10] Although in some cases the phrase "in accordance with" might be read to mean "under" and thus perhaps not to require compliance, *see, e.g.*, *Straus v. Foxworth*, 231 U.S. 162, 169 (1913), we believe that applying such an interpretation here would conflict with the Act's purposes. After all, the Act mandates that the "[t]he growth tiers adopted by a local jurisdiction *shall* meet the . . . criteria," LU § 1-508(a) (emphasis added), and if local jurisdictions could simply ignore those criteria in adopting their tiers, there would be no point in mandating the criteria in the first place. Moreover, our interpretation finds support in the Act's legislative history. During floor debates on the Act, the bill's floor leader (and one of its sponsors) explained that the bill would require local jurisdictions to adopt "growth tiers *in accordance with* specified *requirements*," suggesting that compliance with the Act's requirements themselves would be necessary, not just that the tiers had to be adopted "under" the Act. Senate Proceedings No. 47 (March 20, 2012) (statement of Sen. Pinsky) (emphasis added); *see also* 87 *Opinions of the Attorney General* 106, 113 n.6 (2002) ("Statements of a legislator acting as floor manager [or as] co-sponsor of the bill . . . while not conclusive on legislative intent, are generally accorded some weight by the courts in determining the meaning of a statute.").

jurisdiction's adoption of growth tiers, and has conditioned the adoption of growth tiers on compliance with the criteria. Growth tiers that do not comply with those criteria do not meet the necessary conditions for a local jurisdiction to approve major residential subdivisions outside of Tier I areas.

We recognize there might be an argument that EN § 9-206(f) merely prohibits a local jurisdiction from authorizing major subdivisions on septics in those areas that have been mis-mapped, and does not put the jurisdiction on the same footing as a jurisdiction that has failed to adopt a tier map at all. However, the statutory language does not support that distinction. Instead, the statute provides that a local jurisdiction cannot approve major subdivisions other than those served by public sewer in a Tier I area unless and "until" the locality adopts, into its comprehensive plan, growth tiers that are "in accordance with" the criteria in the Land Use Article. A map that is not "in accordance with" those criteria, by definition, cannot satisfy the condition that the Act places on a local jurisdiction's authority to approve most types of major subdivisions, regardless of whether the subdivision will be built in a compliant or noncompliant area. That interpretation also furthers the core purposes of the Act, namely, to allocate the burden of reducing nutrient pollution so as to preserve agricultural and other existing uses and to enable the State to identify, in the State's upcoming WIP, detailed strategies for reducing that pollution. *See* 2012 Md. Laws, ch. 149, Preamble. A local jurisdiction's adoption of noncompliant tiers, even if a subdivision has not yet been approved in a noncompliant area, could cast doubt on whether Maryland has given the requisite "reasonable assurance" to EPA that it can meet its obligations under the Bay TMDL.

Nonetheless, there may be circumstances under which a local jurisdiction's mapping errors are so minor that the locality should be deemed to have substantially complied with the Act's criteria. Substantial compliance is generally sufficient to satisfy a statutory requirement when it "has fully attained the objective of the statute as though there had been complete and literal compliance," that is, where "there has been such compliance with the essential requirements of the statutory provision as may be sufficient for the accomplishment of its purpose." 64 *Opinions of the Attorney General* 20, 24-25 (1979) (quoting *Houman v. Mayor & Council of Borough of Pompton Lakes*, 155 N.J. Super. 129, 169-70 (Law. Div. 1977)). Thus, substantial compliance might be achieved here where mis-mapping does not prevent the tiers from serving the

Act's purposes.[11]  But, to be clear, it seems highly unlikely that a local jurisdiction could substantially comply with the statute by authorizing a subdivision in a mis-tiered area when the subdivision would not be permitted if the area had been placed in the correct tier.

Whether a particular tier map meets the Act's criteria in a particular instance may also depend in part on the extent to which the criteria allow flexibility as to how they may be implemented. Some criteria do not give the local jurisdictions any flexibility as to the tier in which particular areas should be located.  One such example is the criterion that requires priority preservation areas and rural legacy areas, both of which are defined by State law and certified by State agencies, to be mapped as Tier IV land.[12]  *See* LU § 1-508(a)(4)(iii).  Other criteria do not seem to allow for much, if any, leeway for a different reason; they rely on definitions that local jurisdictions must apply under other laws when creating various statutorily mandated plans.  For example, areas that are "planned to be served by public sewerage systems," LU § 1-508(a)(2), are designated by the jurisdiction's water and sewer plans, *see* EN § 9-505, while "areas planned or zoned . . . for land, agricultural, or resource protection, preservation, or conservation," LU § 1-508(a)(4)(i), are  presumably  designated  in  the  jurisdiction's

---

[11]  Given that comprehensive plans are to be "comprehensive"—that is, they are to be integrated and long-range planning documents as distinct from piecemeal zoning—and given that tier mapping is to be done in comprehensive plans, we are not suggesting that a local jurisdiction could easily show that its map is in substantial compliance despite the mis-mapping of a particular area. *See, e.g.*, LU § 3-110 (plans are to "serve as a guide for the development and economic and social well-being of the local jurisdiction"); *Coffey v. Maryland-Nat'l Capital Park & Planning Comm'n*, 293 Md. 24, 31 (1982) (cautioning that the cumulative effect of not requiring subdivision plans to comport with planning documents "can be illustrated by comparison to the putting of water in a teacup drop by drop. After a period of time there comes the drop which will cause the cup to overflow").

[12]  A "Priority Preservation Area" is an area certified as such by the Department of Agriculture and the Department of Planning based on certain agricultural or forestry attributes. *See* AG § 2-518; SFP § 5-408. A "Rural Legacy Area" is an area designated as such under the Rural Legacy Program as an area "rich in a multiple of agricultural, forestry, natural, and cultural resources." NR § 5-9A-02(i).

comprehensive plans or zoning regulations.[13] The Legislature's intent for those criteria, as explained in an uncodified section of the Act, was apparently that local jurisdictions would use their other plans to make their tier maps. *See* 2012 Md. Laws, ch. 149, § 4(a).

However, the Act contains other criteria that seem to allow local jurisdictions some interpretive leeway in implementing the Act. For example, LU § 1-508(a)(3) requires the inclusion in Tier III of areas not planned for sewer service that are "not dominated by" either forest land or agricultural land. Because the phrase "not dominated by" does not lend itself to any one specific meaning, this criterion appears to allow local jurisdictions at least some flexibility in determining which areas fit within that category and thus at least some flexibility in mapping tiers that are "in accordance with" that criterion. *See* MDP Implementation Guide at 13 (explaining that "[t]here are a number of reasonable approaches to delineating areas that . . . are dominated by agricultural and forest lands or other natural areas" and recommending a few potential approaches for how to apply that criterion); *see also id.* at 12 (explaining that there are some geographic areas that may not clearly "fit" within any particular tier and that some of those areas "can be designated as any Tier on the Tier map").

Still, the extent and nature of a local jurisdiction's leeway regarding even those generally worded criteria may be circumscribed by two interrelated considerations. First, as noted above, many of those criteria are couched in terms that the State or local governments use in other contexts, so a local jurisdiction's departure from that usage solely for purposes of the Act might be subject to challenge as an abuse of discretion.[14] Second, we are to

---

[13] *See, e.g.*, LU §§ 3-201, 3-203 (addressing the preparation of comprehensive plans), 4-202 (addressing zoning regulations "in accordance with the plan"). Comprehensive plans must contain elements and visions responsive to the State's environmental and natural resource laws. *See* LU §§ 3-102 through 3-113.

[14] For example, jurisdictions with areas within the Chesapeake and Atlantic Coastal Bays Critical Area might already have adopted an approach for determining whether an area is "dominated by forest" or agriculture. That is because regulations promulgated by the Critical Areas Commission define "limited development" areas for purposes of the State's critical area laws, in part, based on whether the areas are "dominated by agriculture, wetland, forest, barren land, surface water, or open space." COMAR 27.01.02.04; *see also* 73 *Opinions of the Attorney General* 57, 62-63 (1988) (addressing the extent of local jurisdictions' authority regarding the program criteria developed by the Commission).

read the Act in light of its purposes.  *See, e.g.*, *Merchant v. State*, 448 Md. 75, 95 (2016) (explaining that a statute must be read "within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute" (citation and internal quotation marks omitted)).  The Act is a State-wide statute, with State-wide goals, such that the effect of a local jurisdiction's noncompliance is not limited solely to the land within the jurisdiction's borders.  One goal of the tier mechanism, as reflected in the Act's Preamble, is to enable Maryland to provide reasonable assurance to EPA that the State can forecast, allocate, and reduce nonpoint source pollution in the Bay.  But that goal could be undermined if the Act were construed to give each local jurisdiction unlimited discretion to construe and apply the tier criteria in widely varying ways.  In sum, with limited exceptions, a local jurisdiction that has failed to map its land "in accordance with" the tier-mapping criteria in Title 1, Subtitle 5 of the Land Use Article will lack the authority to approve major residential subdivisions on septics, because it will not have met the conditions that State law places on that authority.

### B.    *Must the State "Enforce" the Tier Definitions?*

You also ask whether any law "compel[s]" the State to "enforce" violations of the Act.  We are not aware of any law that compels the State to enforce the Act or its criteria in the sense of requiring the State to bring an enforcement action against a local jurisdiction for mis-mapping its land.  However, that does not mean that the State lacks any means to ensure compliance with the Act's requirements.  Instead, in our view, there are at least two types of mechanisms by which the State may be able to enforce the Act.[15]

First, even before passage of the Act, MDE had authority over certain aspects of the planning process for sewerage systems, including septic systems.  More specifically, MDE had the power to approve county water and sewer plans, to sign off on final subdivision plats for residential developments, and to approve permits for the installation of individual sewerage systems.  The Act did not take away any of that authority.  To the contrary, the General Assembly sought to use existing "planning processes such as . . . water and sewer plan[s], and subdivision plan approval" to

---

[15] We do not mean to foreclose the possibility that there might be other methods that are not discussed in this Opinion through which the State could, in effect, enforce the Act.

accomplish its purpose of "[p]lanning for growth served by on-site sewage disposal systems and shared systems." 2012 Md. Laws, ch. 149, Preamble. In our opinion, when MDE, or its designee, is performing the functions assigned to it as part of these processes, the agency must at least consider a local jurisdiction's compliance with the Act and, in that sense, "enforce" it to some degree.

Second, MDE has discretionary authority to enforce certain provisions of the Environment Article, such as the provision in EN § 9-206(f) that prohibits a local jurisdiction from approving major subdivisions other than those served by public sewer in a Tier I area until the locality has adopted a tier map in accordance with the Act. Although the statute does not expressly "compel" the State to take enforcement action against a noncompliant local jurisdiction, MDE may need to take action under certain circumstances to ensure that the State complies with its own obligations under the Clean Water Act to implement the Bay TMDL.

### 1. MDE Must Consider Compliance with the Act When Exercising its Authority Over Sewerage Matters

The first way in which MDE can take steps to ensure compliance with the Act is through its powers to review and approve certain plans, plats, and permits that relate to sewerage. Three such powers are relevant here. First, MDE is charged with approving subdivision plats that developers must submit before constructing residential subdivisions. *See* EN § 9-512(d); COMAR 26.04.03.02I; COMAR 26.04.03.02K. Second, MDE is charged with approving applications for sewage disposal permits that lot owners or developers must have before installing any sewerage system, including septic systems. *See* EN §§ 9-204(h), 9-252(b)(4); *see also* COMAR 26.04.02. Third, MDE is charged with approving county water and sewer plans. *See* EN § 9-503.

### a. MDE's Approval of Subdivision Plats

We first consider whether MDE can ensure compliance with the Act through its authority to approve subdivision plats. MDE has long had a role with respect to subdivision plats for residential development. Although the principal power to approve subdivision plats lies with each local jurisdiction's planning commission (or similar local entity), a person may not sell or build on land unless a plat has been submitted to and approved by the Secretary of the Environment or the Secretary's designee. *See* EN §§ 9-206(j), 9-512; *see also* COMAR 26.04.03.02I ("Lots may not be sold for purposes of construction or construction begun in any subdivision

without the approval" of the Secretary or his designee); COMAR 26.04.03.02K ("A subdivision plat may not be recorded in the land record offices of this State unless it bears the signature of the Secretary or the Secretary's designee."). MDE typically delegates this approval authority to the local health officer in each county, but the ultimate authority over the process remains with MDE.[16]

Under that scheme, MDE or its designee may not approve a subdivision plat unless the proposed sewerage system conforms to the applicable county's water and sewer plan and will adequately serve the development. EN § 9-512(d). Moreover, the Act added a requirement that applies specifically to plats for proposed major subdivisions in Tier III or Tier IV areas. EN § 9-206(j). Under that new requirement, a platted lot for a major subdivision in a Tier III or Tier IV area may not be developed or sold unless "there [has] been submitted to [MDE] . . . [d]ocumentation by the local jurisdiction that a major subdivision on-site sewage disposal system, a community sewerage system, or a shared facility is in a: (i) Tier III area as adopted by the local jurisdiction" or (ii) a Tier IV area that is exempt from the general prohibition on major residential subdivisions in such areas. EN § 9-206(j)(3).

In our opinion, the Act's addition of the "documentation" requirement makes clear that the General Assembly intended MDE to use its power over the subdivision approval process to enforce certain aspects of the Act. Although the statute does not say explicitly that lack of sufficient documentation under § 9-206(j)(3) is a reason for MDE to deny approval of a subdivision plat, the provision would make little sense if MDE could simply disregard

---

[16] Local health officers, despite their name, are State officials, and the Secretary's designation of a county health officer to perform these functions is the delegation of a State function. *See Sugarloaf Citizens Ass'n v. Frederick County Bd. of Appeals*, 227 Md. App. 536, 549 (2016) ("The decision of the local health officer on a septic system [proposed in a site plan] is not a matter of county authority, but State-delegated authority."); *see also id.* ("[S]eptic system decisions are matters of *state* law and regulations." (emphasis in original)). For purposes of this analysis, then, it does not matter whether the applications are reviewed by MDE or the Secretary's designee. In any event, county health officers presumably lack the authority to take actions not permitted by State law. *See, e.g.*, *Perdue Farms Inc. v. Hadder*, 109 Md. App. 582, 590 (1996) ("We believe that the [local] Board's authority to impose the condition complained of is preempted by state law, because the Board's conditions would prohibit [nitrogen] spraying in situations in which the State wants to encourage it.").

noncompliance with the requirement when reviewing plat applications. After all, the General Assembly was aware of MDE's existing authority over subdivision plats, and presumably intended the documentation provision to work in conjunction with that authority. *See* 2012 Md. Laws, ch. 149, Preamble (explaining that the Legislature intended to use "established planning processes" to achieve the Act's purposes). Indeed, the legislative history confirms that the Legislature intended MDE to use the documentation requirement to enforce the Act to at least some degree. As explained by the sponsor of the floor amendments that added the documentation provision, "MDE or MDE's designee will check on final subdivision plat approval that a major subdivision on septics is in the correct growth tier," and MDE "will not sign off on final plats without that factual check." Senate Proceedings No. 50, 2012 Leg., Reg. Sess. (March 23, 2012, Session No. 1) (statement of Sen. Middleton); *see also Hearing Before the House Envtl. Affairs Comm. on S.B. 236*, 2012 Leg., Reg. Sess. (April 4, 2012) (testimony of Joe Bryce, the Governor's Chief Legislative Officer) ("[T]here is a provision [in the bill] . . . that adds to [MDE's] existing authority in approving these developments to allow [MDE] to make sure that the major subdivision that's submitted is in fact in the local jurisdiction's Tier III area and not in a Tier IV [area], and if it is not in a Tier III area then they would have the ability to not approve [the subdivision] . . . .").

There remains a question, however, about the *extent* of MDE's power to enforce the Act through the subdivision approval process. Unquestionably, under the documentation provision, MDE or its designee may not approve a plat proposing a major residential subdivision in a Tier III or Tier IV area that is ineligible for the subdivision according to the local jurisdiction's own tier map. However, it is not as clear whether MDE must deny an application for a subdivision in an area that the locality has mis-mapped as Tier III instead of Tier IV—that is, when the project, on its face, is in a tier that the local jurisdiction has mapped as eligible for it, but the map violates the Act. Given that the statute requires "documentation" that the proposed subdivision is in a "Tier III area *as adopted by* the local jurisdiction," EN § 9-206(j)(3) (emphasis added), the statute could be read to authorize MDE only to examine the locality's tier map "as adopted," and not consider whether the area had been *properly* categorized as Tier III.

But we must read the provision in light of the General Assembly's "purpose, the ends to be accomplished, [and] the evils to be remedied by" the Act. *Lockshin*, 412 Md. at 274. Viewed through that lens, the Act is best read to authorize MDE to decline

to approve a plat for a major subdivision where the local jurisdiction's tier map conflicts with the Act's criteria. The Legislature's purposes in adopting the tier mechanism were to help predict growth in septics discharges, impose limits on development using septics so as to preserve agriculture and protect the Bay, and provide "reasonable assurance" to EPA that the State can fulfill its obligations under the Bay TMDL. Given those purposes, we think it unlikely the Legislature intended to immunize a local jurisdiction's blatant failure to comply with the Act's tier-mapping criteria from any meaningful State review or to allow a local jurisdiction to undermine the State's ability to achieve its goals under the Clean Water Act. Instead, in our view, a local jurisdiction that has mapped a Tier IV area as Tier III has not validly "adopted" a tier map in the first place, *see* Part II.A, *supra*, and we do not believe the General Assembly could have intended such a tier map to suffice as sufficient "documentation" under EN § 9-206(j)(3) when the map violates State law and is therefore invalid. *See, e.g.*, *Hewitt*, 220 Md. at 63 (explaining that a local power delegated by the Legislature is "subject to the terms upon which it is delegated"); *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 512 (2004) (voiding a local ordinance that was "not in conformity" with State law); *West Montgomery County Citizens Ass'n*, 309 Md. at 198-99 (invalidating county's exercise of power "in any manner other than that specifically authorized" by State law). Thus, we conclude that the documentation provision permits MDE, or its designee, to consider whether the locality has correctly applied the Act's tier-mapping criteria.[17]

Our reading of the documentation provision is reinforced by the interpretation that both MDP and MDE gave to the Act soon after its passage. *See, e.g.*, *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Md.*, 305 Md. 145, 161 (1986) (explaining that the contemporaneous interpretation of a statute soon after its

---

[17] The General Assembly also did not alter MDE's broad powers to curb water pollution, to meet the nutrient pollution goals of the Chesapeake Bay agreement, and to cooperate with other agencies. *See, e.g.*, EN §§ 9-302(b), 9-319. We read the documentation requirement in the context of the statutory scheme of which MDE's subdivision approval and water pollution prevention duties are a part. *See, e.g.*, *Lockshin*, 412 Md. 274-75. In light of that statutory scheme, the documentation requirement should be read to allow MDE to meet its obligations under the Clean Water Act. *See Anacostia Riverkeeper*, 447 Md. at 127-28 (explaining that EPA approved Maryland's plans "in reliance on" its representations (internal quotation marks and emphasis omitted)).

enactment by an agency tasked with its implementation is entitled to at least some weight in construing the statute).  For example, the Secretaries of both departments informed Cecil County in September of 2013 that "appropriate steps to ensure compliance with State law" would include, "if necessary, disapproval of major subdivision plats in Tier 3 areas that do not comply with [the Act]." Letter from MDE Secretary Robert M. Summers, Ph.D., and MDP Secretary Richard Eberhardt Hall to Hon. Tari Moore, County Executive, Cecil County (Sept. 13, 2013); *see also* Letter from Jay Sakai, Director of MDE's Water Mgmt. Admin., to Stephanie Garrity, Health Officer, Cecil County Health Department (Jan. 2014) (stating that MDE "may withhold approval" of a subdivision plat "if the proposed subdivision does not comply with . . . the criteria set forth in Section 1-508 of the Land Use Article").

Although there is some evidence in the legislative history suggesting that the documentation provision should not be read to give MDE authority to assess the accuracy of a locality's tier map, that history is not conclusive.  According to the legislative record, the bill as introduced would have expressly prohibited MDE from approving a plat for a major subdivision on septics in a Tier III area unless MDE had "determined that the [locality's] Tier III or Tier IV growth tiers are consistent with" the Act's tier-mapping criteria. S.B. 236 (first reader, proposed EN § 9-206(b)(2)(iv)(2)). Similarly, the bill was amended at one point to expressly provide that MDE "may not approve a major residential subdivision" on septics "until the local jurisdiction adopts the growth tiers in accordance with" the Act, and to require local jurisdictions to "certify" their growth tiers to MDP.  Amendments to S.B. 236, Senate Educ., Health, and Envtl. Affairs Comm. at 8 (March 23, 2012) ("Senate Committee Amendments").  However, in a later floor amendment, the Senate:  (1) deleted the provision that had expressly required MDE to determine whether a locality's Tier III and IV areas complied with the Act; (2) amended the bill to prohibit a *local jurisdiction*, rather than MDE, from approving major residential subdivisions on septics until it adopted tiers; (3) removed the requirement for local jurisdictions to "certify" their tiers to MDP; and (4) added the documentation provision in EN § 9-206(j)(3).  *See* Floor Amendments to S.B. 236 (March 23, 2012).

In proposing those floor amendments, Senator Middleton explained that they were a compromise brokered by Governor O'Malley's Administration in response to concerns raised by counties, developers, farmers, and others.  *See* Senate Proceedings No. 50 (March 23, 2012, Session #1).  In particular, the Maryland

Association of Counties ("MACo") had raised concerns that the legislation, by explicitly tasking MDE with the approval of residential subdivisions under the Act, would give MDE a new "broad-based" power over *all* land-use decisions regarding those subdivisions, even over things like "lot lines and street lines." *Hearing on H.B. 445 Before the House Envtl. Matters Comm.*, 2012 Leg., Reg. Sess. (Feb. 15, 2012) (written testimony of MACo on the bill cross-filed with S.B. 236). Although the original bill had not expressly expanded MDE's authority that far, Senator Middleton explained that there were nonetheless concerns that local land-use decisions would now be made by "a State agency" that would not have "the accountability [to local property owners] that a local board of elected officials do[es]." Senate Proceedings No. 50 (March 23, 2012, Session No. 1). In response to those concerns, he said, the amendments provided that "local jurisdiction[s] will approve the subdivision plats . . . rather than MDE" and that the "final authority in deciding whether a property . . . should go in Tier III or Tier IV [will] lie[] with the county." *Id.*; *see also* Senate Proceedings No. 53 (March 27, 2012) (statement of Sen. Pinsky) (stating that the floor amendments took "approval" authority away from the State). Similarly, in responding to a question about what the "remedy" might be if a county takes an area that "clearly meets the criteria" for Tier IV but "put[s] it in Tier III anyhow," Senator Middleton stated that the county "would be the ultimate decider of what is [in] Tier IV or Tier III." Senate Proceedings No. 50A (March 23, 2012, Session No. 2). That testimony, along with the General Assembly's decision to delete the provision that had expressly required MDE to assess the accuracy of a locality's tier map, might suggest that the Legislature did not intend MDE to check the accuracy of localities' tier maps during the subdivision approval process.

However, at the same time the Legislature made those changes, it also added the "documentation" provision in EN § 9-206(j)(3). That change expressly preserved a role for MDE in ensuring compliance with the Act, while clarifying that MDE would not have any new, broad-based power over non-environmentally-related matters like lot and street lines. In fact, when addressing the documentation provision specifically, Senator Middleton explained that it would serve as a "safeguard[] to ensure that local jurisdictions follow the . . . framework for the adoption of growth tiers." Senate Proceedings No. 50 (March 23, 2012, Session # 1) (statement of Sen. Middleton). In doing so, he emphasized that, under the provision, "MDE w[ould] be able to ensure at [the] final subdivision plat stage . . . that a local

jurisdiction's approval of a major subdivision on septics is accurate," and that MDE will "make sure that it's in the right tier to prevent a county from saying . . . we think this ought to be in a Tier IV [area] and take what belongs in a Tier III and move it over to a Tier IV." *Id.* Those statements, in contrast to some of the other statements quoted above, suggest that the Legislature indeed intended MDE to use the documentation provision to ensure that local jurisdictions' Tier III and Tier IV areas complied with the Act. In short, the legislative history is not entirely clear as to the intended effect of the amendments. We therefore hesitate to read too much into the Legislature's decision to delete a few draft provisions as part of a sweeping compromise amendment, especially when the same amendment added another provision that seems to serve goals similar to some of the goals of the deleted provisions.

Rather, in our view, the best way to make sense of the legislative history is that the floor amendments imposed certain limits on MDE's ability to review a locality's tier map as part of the subdivision approval process but did not deprive MDE of that ability entirely. More specifically, under the bill as previously drafted, MDE and MDP had to approve a local jurisdiction's tier map and would have had direct and total veto power over every aspect of a local jurisdiction's tier map. That is, local jurisdictions would have to "certify" their tier maps to MDP, and MDE had to submit the "initial" subdivision plat application under each local jurisdiction's new tier map to MDP for advice on whether the locality's growth tiers complied with the Act. Then, if the tiers did not comply with the Act, MDE would have to refuse to approve the plat. *See* S.B. 236 (first reader, proposed EN § 9-206(d)). Under that version of the bill, therefore, MDP and MDE would have been able to substitute their judgment for that of the local jurisdiction in every situation, even when the definitions in the Act allow for flexibility about how to apply the criteria to each local jurisdiction's specific situation.

Under the Act as altered by the Senate floor amendments, however, MDE and MDP do not have any direct veto power over a local jurisdiction's tier map. Although MDE still has authority, as reflected in the documentation provision, to ensure that a local jurisdiction does not authorize major subdivisions in areas where the Act clearly forbids those types of subdivisions—such as in priority preservation areas and rural legacy areas—the Act does not permit MDE to second-guess a locality's implementation of the more generally worded criteria that allow for flexibility as to their application. *See* Senate Proceedings No. 53 (March 27, 2012)

(statement of Sen. Pinsky) (explaining that the application of the criteria for "dominated by" agricultural and forest land in particular would be left to the counties to decide). That understanding of the amendments gives meaning both to the Legislature's decision to delete certain provisions of the original bill and its decision to add to the documentation provision in EN § 9-206(j).[18] In other words, the compromise struck by the O'Malley Administration appears to have been that MDE and MDP lost the direct power to veto local subdivision decisions (which had been of great concern to the local jurisdictions), but MDE gained the more limited review authority granted by the documentation provision. Thus, although the legislative history raises questions about the extent of MDE's power to use the subdivision approval process to enforce the Act, the General Assembly more likely intended that MDE (or its designee) would have at least some power to reject plat applications based on a local jurisdiction's failure to comply with the Act's criteria.

Given that you asked whether the State "must" enforce the Act, the question then becomes the extent to which MDE is *required* to examine the "documentation" submitted to it to determine whether a local jurisdiction has complied with the Act. Although MDE might not always have the expertise to determine for itself whether the locality's tier map complies with the Act, the Department of Planning may comment on proposed tier maps prior to their adoption. *See* LU §§ 1-505, 1-507. MDP thus might flag for MDE the accuracy of a local jurisdiction's tier-mapping. Although we cannot generalize about the level of scrutiny that MDE must apply to a locality's "documentation" in every case, if MDE is aware that a local jurisdiction may have violated the Act, we think MDE or its designee must at least consider that factor in

---

[18] Our understanding of the amendments could even be read as consistent with Senator Middleton's comments that local jurisdictions would be the "ultimate decider[s]" about their maps, Senate Proceedings No. 50A (March 23, 2012, Session #2), and that the tier maps might not always be "what the State would like them to be at the end of the day," Senate Proceedings No. 50 (March 23, 2012, Session No. 1). In other words, where the definitions in the Act give the localities leeway to make choices about how to apply the tier-mapping criteria, the localities can make those decisions, even if MDE and MDP might have preferred them to apply those criteria differently. But the local jurisdictions cannot ignore the criteria entirely where the Act does not leave them flexibility about how to apply those criteria, at least if they wish to authorize major residential subdivisions outside of Tier I areas.

reviewing the plat application. *See, e.g., Anacostia Riverkeeper*, 447 Md. at 121 ("'We must be satisfied from the record that the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[.]'" (quoting *Natural Res. Def. Council v. United States Envt'l Prot. Agency*, 808 F.3d 556, 569 (2nd Cir. 2015)) (additional quotation marks and citation omitted)); *cf. Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*, 896 F.3d 600, 612 (4th Cir. 2018) (agency "may not turn a blind eye to errors and omissions apparent on the face of the [submissions]").[19]

In sum, when the documentation requirement is read in light of the legislative purpose, we think that MDE (or its designee) may enforce the Act's criteria through the subdivision plat approval process and may not simply disregard a local jurisdiction's failure to comply with the Act's criteria. The level of scrutiny that MDE must apply to the applicant's "documentation" in a particular case will turn on the facts of that case. However, given the ambiguity in the statute and in the legislative history, the General Assembly might wish to clarify the extent to which MDE must enforce the Act through the subdivision approval process.

### b. Sewerage disposal permits

Regardless of whether the documentation provision added by the Act allows MDE to consider the accuracy of a local jurisdiction's tier map as part of its subdivision approval process, nothing in the Act or its legislative history indicates that the General Assembly intended to diminish any of MDE's existing authority over sewerage matters. One of those powers that existed before the Act is that, in addition to subdivision plat approval, MDE must approve the installation of a developer's sewage disposal system before the developer may build a subdivision served by septics. *See* EN § 9-252(b)(4); *see also* COMAR 26.04.02.03J ("The permits required by this regulation are in addition to any approval to subdivide land pursuant to COMAR 26.04.03."). As with subdivision plats, MDE typically delegates

---

[19] We note that the burden of establishing the adequacy of "documentation" in support of a subdivision plat application likely falls on the applicant, as the party that is asking MDE or its designee to change the status quo. *See, e.g.*, *Grasslands Plantation, Inc. v. Frizz-King Enterprises, LLC*, 410 Md. 191, 216-17 (2009) (explaining that the subdivision applicant, as the party seeking to change the status quo by developing the site, bore the burden of proof).

this responsibility to county health officers, but the ultimate regulatory authority belongs to MDE.

Under MDE's regulations governing this permitting process, the Department or its designee "may issue a permit for an on-site sewage disposal system" only "if it determines that the site and proposed design can safely dispose of sewage *and conform with applicable laws and regulations*."    COMAR    26.04.02.03B (emphasis added).    In our view, the "applicable laws and regulations" with which the proposed site for a septic system must conform include the Act's provisions prohibiting major subdivisions on septics under certain circumstances, such as when the local jurisdiction declines to adopt a tier map, its tier map was not adopted "in accordance with" the Act, or the subdivision is not located in a tier eligible for that use.  In other words, a proposal to develop a major residential subdivision on septics in an area that is ineligible for that use under the Act would not "conform with applicable laws and regulations."  Thus, under MDE's regulations, it appears that the agency must at least consider compliance with the Act as part of the disposal-permit process and would have little, if any, discretion to overlook a noncompliant tier map when reviewing a permit application to build a septic system for a major residential subdivision.

### c.    *County Water and Sewer Plans*

We next examine the extent to which MDE may enforce the Act's requirements through its role in approving county water and sewer plans.  Under Maryland law, each county must adopt a water and sewer plan, and each plan (or plan amendment) is subject to MDE's approval.  EN § 9-503.  Among other things, a plan must project population growth, indicate the "quantity and quality of waste to be discharged into the waters of this State," "[d]escribe . . . each area in the county where . . . [a]n individual sewerage system may be installed," and describe areas planned for multiuse or community sewerage systems.  EN § 9-505(a)(12)(iii), (13)(v-vi, viii); *see also Bethel World Outreach Church v. Montgomery County*, 184 Md. App. 572, 578 (2009) (explaining the process). Further, as is particularly important here, each county's water and sewer plan must be "consistent with all county and local comprehensive plans," as well as "with the laws of this State that relate to . . . water pollution, and land use[.]"  EN § 9-505(a)(1), (5); *see also* COMAR 26.03.01.02(A) (requiring that water and

sewer plans "develop . . . sewerage systems in a way consistent with county comprehensive planning").

Because a county's water and sewer plan must be consistent with both the county's comprehensive plan (which includes the county's tier map) and the State's land use laws (which include the Act's tier-mapping requirements), the water and sewer plan must necessarily comply with the requirements of the Act. Thus, MDE may not approve a plan that conflicts either with the county's tier map or with the tier-mapping criteria in the Act. Of course, the extent to which a particular water and sewer plan might conflict with the Act will depend on the content of that particular plan, and it is not possible to provide comprehensive guidance here about every circumstance under which there might be a conflict. But, at the very least, MDE should take steps to ensure that a county's water and sewer plan is consistent with the Act.

The question again becomes the extent of MDE's obligation to examine whether a county's plan complies with its tier map or whether the tier map complies with the Act's criteria. Recognizing that MDE might not have the knowledge or expertise to evaluate a county's water and sewer plan for compliance with laws administered by other agencies, the General Assembly included in the statute a requirement that MDE seek input from those other agencies. For instance, before approving a proposed water and sewer plan or plan amendment, MDE must submit the plan to "the Department of Planning for advice on the consistency of the proposal with the local master plan and other appropriate matters." EN § 9-507(b). The advice MDE receives from MDP (and from other agencies) may help to identify conflicts with the Act. In fact, MDP will likely already have evaluated a local jurisdictions' tier mapping during the comment process under the Act. *See* LU §§ 1-505, 1-507. Thus, if MDP has advised MDE that a county has adopted mis-mapped tiers, and if those mis-mapped tiers call into question the accuracy of the county's proposed water and sewer plan, we think that MDE must at least consider that fact when reviewing the proposed plan. *See, e.g.*, *Anacostia Riverkeeper*, 447 Md. at 121; *cf. Ergon-W. Virginia, Inc.*, 896 F.3d at 612.[20]

---

[20] Additionally, under MDE's regulations governing the water-and-sewer-plan process, "[c]onsideration shall be given to . . . all governmental, industrial, and other plans for privately owned facilities regarding water and sewerage at any level." COMAR 26.03.01.02(A)(3); *see also* EN § 9-510(b) (granting MDE broad authority to adopt regulations to "carry out the provisions of [the subtitle pertaining to water and sewer plans]"); *Showell*, 316 Md. at 270-71 (explaining that

### 2. *MDE's Discretionary Enforcement Powers*

The second way in which the State may be able to ensure compliance with the Act is through MDE's discretionary authority to enforce certain violations of the Environment Article. The Department is authorized to use "the provisions of [EN] §§ 9-334 through 9-344 . . . to enforce violations of" Title 9, Subtitle 2 of the Environment Article. EN § 9-268. Title 9, Subtitle 2 of the Environment Article, in turn, includes EN § 9-206(f), which generally prohibits a local jurisdiction from "authoriz[ing] a residential major subdivision served by on-site sewage disposal systems, community sewerage systems, or shared systems until the local jurisdiction adopts the growth tiers in accordance with" Title 1, Subtitle 5 of the Land Use Article. *See* Part II.A, *supra*. Thus, if a local jurisdiction approves a major residential subdivision— other than a major subdivision served by public sewer in Tier I— without adopting tiers that comply with the Act (or, for that matter, if the local jurisdiction violates any other provision of EN § 9-206), MDE may use EN §§ 9-334 through 9-344 to enforce EN § 9-206's requirements.

Under EN §§ 9-334 through 9-344, the Department "shall issue a written complaint if the Department has reasonable grounds to believe that the person to whom the complaint is directed has violated" either "(1) This subtitle; (2) Any rule or regulation adopted under this subtitle; or (3) Any order or permit issued under this subtitle." EN § 9-334(a).[21] Although that provision only

---

MDE's duties with regard to water pollution require it to "cooperate with agencies of other states and the federal government"). Thus, in reviewing a proposed plan, MDE must give "consideration" to the Bay TMDL and its own WIPs to determine whether the planned methods of waste water disposal are consistent with its obligations under those plans. Given that MDE has presented the tier designations to EPA as a method of minimizing the adverse effects of septics on the Bay, and EPA has approved the tier-based restrictions as a method of reducing discharges, MDE might have to disapprove a water and sewer plan that conflicts with the Act in order to comply with its promises under the Bay TMDL.

[21] Even though EN § 9-334 provides that MDE "shall" issue a complaint if MDE "has reasonable grounds to believe" that a violation occurred, MDE is not required to find "reasonable grounds" for a violation, and the agency is thus not required to issue an order or seek injunctive relief. Instead, MDE's enforcement power under EN §§ 9-334 through 9-344 is discretionary. *See e.g.*, *Falls Rd. Cmty. Ass'n, Inc.*

mentions violations of subtitle *3*, those same rules apply to violations of subtitle 2 by operation of EN § 9-268. After serving a complaint, MDE may issue an order, which is final unless the person served with the order requests a hearing. *See* EN §§ 9-335 to 338. Alternatively, MDE "may bring an action for injunctive relief against any person who violates any provision of this subtitle [or subtitle 2] or any rule, regulation, order, or permit adopted or issued by [MDE] under this subtitle [or subtitle 2]." EN § 9-339; *see also* EN § 9-268. The term "person" in those provisions explicitly includes "any county, municipal corporation, or other political subdivision of this State." EN § 9-301. Thus, MDE may take enforcement action against a county for authorizing a major subdivision in violation of EN § 9-206.

Although MDE is not *required* by the Environment Article to use these provisions to enforce the Act's requirements, the Department might—depending on the severity of the violation— need to take action to ensure that Maryland complies with its own obligations under the Clean Water Act, the Chesapeake Bay Plan, and the Bay TMDL. As explained above, Maryland must provide EPA with "reasonable assurance" that Maryland can achieve the load reductions assigned to it under the Bay TMDL. *See Farm Bureau*, 792 F.3d at 291-92 (explaining the role of reasonable assurances in TMDLs); *see also Anacostia Riverkeeper*, 447 Md. at 109-10 (describing EPA's "reasonable assurance" findings regarding Maryland's Phase I WIP). To do that, Maryland had to demonstrate how it will offset any unplanned growth in a particular sector by further reducing discharges from other sectors. *See* Phase III Interim Letter. Maryland then expressly relied on the Act to show EPA how it would satisfy that requirement. *See* EPA Evaluation of Phase II WIP at 1, 3. A local jurisdiction's disregard of the requirements of the Act could cast doubt on whether Maryland has given "reasonable assurance" that the State is complying with the Bay TMDL. In turn, if EPA determines that the State is out of compliance, EPA can take any number of "back-stop actions" that could lead to a loss of federal funding and the

---

*v. Baltimore County*, 437 Md. 115, 142 (2014) (explaining that even where a government agency is "charged generally with the responsibility to enforce" certain requirements, it cannot possibly pursue enforcement of every arguable violation. Rather, "[t]here are a myriad of discretionary decisions made in determining how to employ limited resources," and "[i]t is well within the discretion of . . . officials to pick and choose among the categories of violations, or to prioritize certain types or areas of enforcement.").

loss of State control over certain aspects of Clean Water Act enforcement. *See* footnote 3, *supra*.[22]

## III

### Conclusion

In answer to your first question, a local jurisdiction that has failed to adopt a tier map that complies with the criteria in the Act is not authorized to approve major residential subdivisions other than those served by public sewer and located in a Tier I area. There may, however, be circumstances under which errors in a local jurisdiction's map are so minor that a court would deem the map to substantially comply with the Act.

Regarding your second question, the Act does not require the State to bring a direct enforcement action against a local jurisdiction to compel the locality to change its tier map. However, MDE is at least required to consider compliance with the Act in reviewing subdivision plat applications, sewerage disposal permits, and water and sewer plans. In addition, MDE has discretionary authority to bring an action to enforce EN § 9-206, including the subsection prohibiting a local jurisdiction from authorizing certain major residential subdivisions until it has adopted a tier map in accordance with the Act. Although that enforcement power is discretionary, a failure on Maryland's part to implement the measures that the State has promised to take under the Clean Water Act could make the State vulnerable to "back-stop" measures threatened by EPA, including a loss of federal funding and increased federal oversight. The threat of those consequences may, as a practical matter, compel the State to enforce its law. Still, given that MDE's enforcement obligations are not entirely clear,

---

[22] Even if MDE chooses not to enforce the Act under EN §§ 9-334 through 9-344, a local jurisdiction that is out of compliance with the Act may face the prospect of private suits by individuals or organizations that object to the local jurisdiction's approval of a major subdivision in violation of the Act. Given the risks of both State and private enforcement, one consequence of a local jurisdiction's failure to comply with the Act might be that potential developers of major subdivisions will be reluctant to undertake such projects in local jurisdictions whose authority to approve those projects is uncertain. *See, e.g.*, *Cleanwater Linganore, Inc. v. Frederick County*, 231 Md. App. 373, 392 (2016) ("Where a developer assumed that its project could be thwarted by a last-minute or mid-stream change to any of these non-zoning laws, it would be less likely to undertake a substantial development at all in a jurisdiction.").

the General Assembly may wish to clarify the State's role in enforcing the Act.

Brian E. Frosh
Attorney General of Maryland

Ann MacNeille
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice

*Paul J. Cucuzzella, Assistant Attorney General, contributed significantly to the preparation of this Opinion.